PEOPLE *v* CLARENCE.WILLIAMS

1. Criminal Law—Preliminary Examination—Right to Counsel —Due Process.

Conducting the preliminary examination of the defendant without the presence of his counsel did not require reversal of the defendant's conviction where the examination was held prior to the United States Supreme Court decision that a defendant has a constitutional right to counsel at his preliminary examination, and where the absence of counsel at the examination did not result in a denial of due process in that the availability of witnesses from outside the state required that the examination be held at that time, counsel for a codefendant thoroughly cross-examined the people's witnesses, which benefited the defendant, the defendant did not renew his motion in the trial court to remand the case for an examination with counsel after the trial court had denied that motion but had specifically indicated that the motion could be made after the transcript had been read and the defendant has not shown, nor does the record indicate, that any statements, admissions, or other prejudicial evidence were received at the examination.

2. Criminal Law—Communication with Others—Due Process.

Defendant's conviction need not be reversed on the ground that he was denied due process by being forbidden to use the telephone while in custody where he was allowed contact with his mother and brother.

References for Points in Headnotes

[1] 21 Am Jur 2d, Criminal Law §§ 313, 314, 449.
[2] 21 Am Jur 2d, Criminal Law § 220 *et seq.*
[3-5] 21 Am Jur 2d, Criminal Law § 368.
29 Am Jur 2d, Evidence § 371.
Admissibility of evidence of photographic identification as affected by allegedly suggestive identification procedures. 39 ALR3d 1000.

3. CRIMINAL LAW—PHOTOGRAPHIC IDENTIFICATION—POLICE PHOTO-
GRAPHS.

> The use of photographs of the criminal defendant for pretrial
> identification purposes was proper even though the photographs
> were from FBI files, no witness used the photographs for posi-
> tive identification of the defendant, and nothing on them in-
> dicated that they were "mug" shots or that the subject was
> connected with criminal activity.

4. CRIMINAL LAW—PHOTOGRAPHIC IDENTIFICATION—POLICE PHOTO-
GRAPHS.

> Admitting the testimony of an FBI agent concerning the man-
> ner of selection and the source of photographs of the defend-
> ant and others, taken from the FBI files and used to identify
> the defendant, does not require the reversal of defendant's
> conviction on the ground that the testimony deprived him of
> his constitutional right to a presumption of innocence by
> implying that he had a prior criminal record where no ob-
> jection to that aspect of the testimony was raised at trial and
> the defense was alibi, not misidentification.

5. CRIMINAL LAW—EVIDENCE—IDENTIFICATION—WEIGHT.

> The weight to be given the testimony of a victim of an armed
> robbery identifying the defendant and his codefendant as the
> perpetrators of the crime was for the jury to decide; that
> the witness became confused when pointing out what each
> codefendant did during the robbery merely created a question
> of fact for the jury.

Appeal from Kent, Stuart Hoffius, J. Submitted
Division 3 February 2, 1972, at Grand Rapids.
(Docket No. 10706.) Decided March 22, 1972.

Clarence Williams was convicted of armed rob-
bery. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *James K. Miller,*
Prosecuting Attorney, and *Donald A. Johnston, III,*
Chief Appellate Attorney, for the people.

*Reginald L. Norris,* for defendant on appeal.

Before: Fitzgerald, P. J., and R. B. Burns and
Holbrook, JJ.

Holbrook, J.  Defendant, Clarence Williams, was
convicted by a jury of the crime of robbery armed,[1]
and sentenced to prison for a term of from 10 to
20 years.

The Alaska Fur Store was robbed on September
30, 1968.  In the early morning of the next day, at
approximately 2:30 a.m., defendant and an alleged
accomplice, David Willis, were stopped for speeding
on the Ohio Turnpike.  Subsequently, both were
charged with the armed robbery of the Alaska Fur
Store.

Defendant on appeal raises four issues for de-
termination.  We combine the first two and restate
the resulting issue.

## I.

Does the fact that the defendant was not repre-
sented by counsel at the preliminary examination
held April 27, 1970, require a reversal of his jury
conviction of robbery armed under *Coleman* v *Ala-
bama*, 399 US 1; 90 S Ct 1999; 26 L Ed 2d 387
(1970)?

Defendant Clarence Williams' counsel was not
present when the preliminary examination was
scheduled to be heard.  However, counsel for code-
fendant Willis was present and because witnesses
from outside the state were available the prelimin-
ary examination was held.

At the preliminary examination codefendant's
counsel thoroughly cross-examined the people's wit-
nesses which resulted in benefit to both defendants.
The only time defendant appeared on the record was
when he complained that he was forbidden to use

---

[1] MCLA 750.529; MSA 28.797.

the phone, although he admitted contact with his mother and brother; and when he answered "no" to the court's question, "Do you want to ask Mr. Fisher (arresting Ohio officer) any questions?"

On May 15, 1970, counsel for defendant Clarence Williams moved to remand to the district court for preliminary examination. The trial judge denied the motion but specifically indicated that defendant could request a remand for new examination with counsel present after the transcript of the original preliminary examination had been read. Defendant did not request such a remand at any time thereafter.

Defendant does not show nor does the record indicate that any statements, admissions, or other prejudicial evidence were received while he was without counsel which affected him adversely. *City of Detroit* v *Wilson,* 19 Mich App 595, 598 (1969).

The case of *People* v *Sullivan,* 18 Mich App 1, 7–8 (1969), controls the question of possible prejudice concerning use of the telephone:

"Restricting a person's right to communicate with friends, relatives, or visitors, as alleged, is strongly disapproved. However, even if true in this case, this allegation of error standing by itself does not presuppose prejudicial error under the existing circumstances."

Defendant asserts that the case of *Coleman* v *Alabama, supra,* is applicable to the instant case requiring reversal of his conviction.

The Supreme Court in the very recent case of *People* v *Rufus Williams,* 386 Mich 277, 286 (1971), discusses the ruling in *Coleman* v *Alabama, supra,* as follows:

"Defendant contends that the failure to have counsel at the preliminary examination precludes using the testimony given at the examination to establish

a factual basis for his plea conviction. Defendant cites *Coleman* v *Alabama* (1970), 339 US 1 (90 S Ct 1999, 26 L Ed 2d 387) for the proposition that he was entitled to court appointed counsel at the preliminary examination. The United States Supreme Court in *Coleman* concluded that under Alabama procedure the preliminary examination constituted a 'critical stage' of the prosecution at which indigent defendants were entitled to court appointed counsel. *Coleman* was decided on June 22, 1970. The preliminary examination of the defendant in the instant case was held on April 29, 1959. We will not attempt to anticipate the United States Supreme Court, and therefore find that *Coleman* is prospective only. This same conclusion was reached in *Kochel* v *State of Maryland* (1970), 10 Md App 11 (267 A2d 755), and in *Commonwealth* v *Brown* (1970), 217 Pa Super 190 (269 A2d 383).

"Evidence of the United States Supreme Court's own feeling on this issue is present in *Wetzel v. North Carolina* (1970), 399 US 934 (90 S Ct 2250, 26 L Ed 2d 805). In *Wetzel,* the majority of the Court declined to grant certiorari, with three justices dissenting on the ground that they felt *Coleman* should be retroactive in all cases.

"Since defendant was represented by counsel at the time his plea of guilty was accepted, and since we hold that *Coleman* applies only prospectively, defendant's contentions on this issue must fail."

In the present case the preliminary examination for defendant was held on April 27, 1970. With *Coleman* being decided subsequently thereto on June 22, 1970, and given prospective effect only, it is not applicable herein. *People* v *Rufus Williams, supra.*

Under the facts in the instant case and the prevailing law applicable on April 27, 1970, we determine that reversible error was not committed by reason of the fact that defendant was without counsel

at the preliminary examination.  *People* v *Sullivan, supra; Lundberg* v *Buchkoe,* 389 F2d 154 (CA 6, 1968).

## II.

Did the admission of and testimony concerning photographs, including one of defendant Clarence Williams, violate his constitutional right to a presumption of innocence by conveying to the jury that he had a previous criminal record?

Defendant contends that the use of these photographs in the case and testimony as to the source of their selection implied to the jury that the persons photographed had possible prior arrests and convictions.  The witness, an FBI agent, testified:

"Well at my office there is a—we maintain a file of miscellaneous photographs, individuals all of different ages and descriptions and in this instance I went through a number of these and tried to pick photographs which were similar in age and general descriptive information to the suspects' photographs."

In the case of *Simmons* v *United States,* 390 US 377, 384; 88 S Ct 967, 971; 19 L Ed 2d 1247, 1253 (1968), it is stated in part as follows:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs.  The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error.  We are unwilling to prohibit its employment, either in

the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall* v *Denno,* 388 US 293, 301–302 [87 S Ct 1967, 1972; 18 L Ed 2d 1199, 1206 (1967)], and with decisions of other courts on the question of identification by photograph.

"Applying the standard to this case, we conclude that petitioner Simmons' claim on this score must fail. In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large."

As we interpret *Simmons,* supra, it was permissible to use the photographs for pretrials identification purposes. The ten photographs showed the faces of individuals. Neither witness used the photographs for positive identification of the defendant Clarence Williams. There was nothing on the photographs in writing or otherwise that would indicate that they were "mug" shots or that any of the persons were connected with criminal activity. Also, they were not shown to the jury.

No objections were made by the defendant to the testimony of the FBI agent concerning the manner of selection, the appearance, and the source of the photographs.

Defendant's objections to the photographs in the trial court raised questions of when the photographs were taken and the authenticity of the photographs but no objections were made on the grounds now as-

serted for the first time in our Court. No objection having been made in the trial court, it cannot be made for the first time on appeal. *People* v *Panknin,* 4 Mich App 19 (1966).

At trial the defense of the defendant was alibi. A witness was produced and testified to substantiate his claim of alibi. In a similar situation our Court ruled in the case of *People* v *McClendon,* 21 Mich App 142, 144 (1970), as follows:

"Defendant next questions the use of photographs to aid in identification. The United States Supreme Court has indicated that photographic identification is allowed. See *Simmons* v. *United States* (1968), 390 US 377 (88 S Ct 967, 19 L Ed 2d 1247). An examination of the record discloses that impropriety on the part of police officers in the use of photographs was neither alleged nor established; therefore, we find no reversible error was committed by the admission of the testimony of the photographic identification by the complaining witness of the defendant.

"Additionally, error, if any, in the conduct of the police lineup or the use of photographs for identification purposes was clearly harmless. The defense was alibi, not mistaken identity."

For the reasons stated, we find no reversible error was committed by the trial court as to issue II.

### III.

Was there sufficient evidence produced at trial to support the jury's verdict of guilty?

It is the claim of defendant that none of the witnesses positively identified him as one of the persons who perpetrated the crime. At trial the people based their case upon the following pertinent facts.

At sometime between 10 a.m. and 11 a.m., September 30, 1968, two men entered the Alaska Fur Com-

pany at 53 Monroe Avenue, N.W., in the City of Grand Rapids. These men were waited on by Henry Bourbon, a furrier employed at the store, and indicated that they were interested in purchasing a fur collar for a girl friend. While Mr. Bourbon was discussing fur collars with these men, Carl Reed, the store manager, noticed that a third man, dressed in a dark suit with a Nehru jacket, was standing just outside, "walking by the store, looked in." Mr. Reed recognized the man outside as having been in the store on at least two prior occasions, once four to six weeks earlier and once about two weeks earlier, alone on both occasions.

After the two men on the inside had talked with Mr. Bourbon for a period of several minutes, the outside man poked his head in the door and told the other two "you have to move the car", because their parking meter had expired. Mr. Bourbon's customers then informed him that "they had to go to class", but indicated that they would return later to continue discussing the matter of the fur collar. Mr. Bourbon advised them to bring the coat in question back with them when they returned so he could find collar pieces to match it.

These two men again entered the store at approximately 3 p.m. that afternoon. Mr. Reed noted that one was wearing a dark gray suit and sunglasses and was carrying an attache case, and the other, who was 5'10" to 6' in height and slender in build, was wearing a tan poplin jacket and a black beret-type cap and had a pock-marked face. Recalling that these men had been waited upon by Mr. Bourbon when they were in the store earlier, Mr. Reed called out, "Mr. Bourbon, here are your customers". Mr. Bourbon, was was working on some furs on the second floor at the time, thereupon came down and again waited on the two men. As he left them, Mr. Reed

once again "saw the same person" in the black Nehru jacket standing outside the store on Monroe Avenue.

On this, their second visit of the day, Mr. Bourbon found the two men were now interested in a fur jacket for one of their mothers. Accordingly, he called in Doris May Sweers, another Alaska Fur employee, and had her model several such jackets for them. Mrs. Sweers modeled furs for the two men for perhaps five minutes and then left, because "they were not satisfied with the merchandise they had seen and I had work to do". She subsequently left the store to deposit company funds with the Union Bank a short distance up the street.

Shortly after Mrs. Sweers departed, one of the men inquired of Mr. Bourbon whether he could purchase a fur by giving him $75 to put it in layaway. Before he could respond, both men produced revolvers and ordered Mr. Bourbon to march into the back room. They simultaneously accosted Mr. Reed and gave him the same orders. As they entered the back room, Mr. Bourbon, hesitated a moment to avoid knocking down a heavily-laden fur rack and one of the armed men yelled, "Get down". In an attempt to warn him of impending peril, Mr. Reed also yelled, "Get down, Hank". But Mr. Bourbon was not quick enough for his assailants and the man with the pock-marked face and black beret struck him over the back of the head with his revolver, rendering him unconscious.

Mr. Reed and Gladys I. Sweetland, a seamstress who was working on a fur in the back room when the two men marched the others in, were ordered to lie down on the floor. Mrs. Sweetland, like Mr. Bourbon before her, was not quick enough to suit the intruders, so she was "pushed" by the same man who struck Mr. Bourbon and fell with her head at the unconscious Mr. Bourbon's feet. Mr. Reed was told

to lie on his face with his arms outstretched in front of him and was then handcuffed in that position. His watch and his billfold, containing approximately $70, were taken from his person.

At about this time, Kay Wietke and Gertrude Fudge, who were out shopping together that day, walked into the Alaska Fur Company Store. As they entered, they noticed a man wearing a black Nehru jacket standing in the recessed doorway just outside the store. Mrs. Fudge recalled that "it looked like he was just watching the people walk by". They entered the store and, according to Mrs. Fudge's testimony, "we looked around—there was not anyone there until all of a sudden we looked in the back and saw the people in the back and before we could do anything further that man (with the Nehru jacket) came in and put a gun in our backs".

The man in the black Nehru jacket then marched Mrs. Wietke and Mrs. Fudge to the back room with the others, instructing them to "Do as you are told. Get to the back and you won't be hurt". They proceeded to lie on the floor as ordered, "but we apparently picked the wrong spot because we laid down * * * in the doorway and then he told us to get up and move over some place else". The robbers relieved Mrs. Wietke and Mrs. Fudge of their purses, that of the former containing some $80 or $90, and Mr. Reed heard the robbers scuffing around the store gathering furs and opening the cash register.

Using "obscene words", they then approached Mr. Reed and demanded that he tell them the location of the back door key. He told them it was hanging on the door frame on the left side near the top and the robbers then warned their victims that "if we raised our heads, they would blow them off". There followed more "foul, awful language" and finally one one of the men asked, "What are you going to do

with them?" and "Shall we kill them?" to which
the other responded, "I am going to have to kill them
all". Mrs. Sweetland stated, "I remained quietly
as possible but I think they heard my heart beat
down on Campau Square".

After the passing of a short time, Mr. Reed tes-
tified, "I heard the front door open and a customer
come in  *  *  *  . I heard a woman pounding on the
table saying, 'is there anybody here?'" Then Mr.
Bourbon, who had been "lying on the floor in a pool
of blood", started to regain consciousness and "was
beside himself". The telephone began ringing. Mr.
Reed told the customer to answer the phone, tell the
person on the line to hang up, and to call the police.
The customer did as she was told, and the police
arrived "very quickly". After running an inventory
of his stock, Mr. Reed calculated that furs costing
Alaska Fur Company $19,013.50 had been stolen.

Meanwhile, Lee Lancaster, an employee of the
Mackenzie Bostock Monroe Company store, which
was located next door to Alaska Fur Company on
Monroe Avenue, was busy loading suits and other
clothing into a station wagon in the alley behind
the store. He heard the back door of Alaska Fur
slam shut and some running footsteps. Looking up
from his work, he observed two men running down
the alley and one of them was carrying a large duffle-
type bag. Mr. Lancaster noted that at the end of
the alley, these men turned out into the street and
disappeared from view. Seconds later, James Teu-
nis, an employee of Yakes Office Supply Company,
was parking his automobile on Ionia Street just
south of Fulton to make a call on a customer. As
he was stepping out of his automobile, Mr. Teunis
saw a man running across the street carrying a
heavy bag, "huffing and puffing and sweating". Then
the man "sat the bag on the curb and sort of rested".

Mr. Teunis exchanged pleasantries with him and recalled, "after I spoke to him, he went down beside me to a car parked down here and the other man came running down with two bags under his arms". These two men loaded the bags into the back of their vehicle and then drove off. The bags were "barracks bags" or "laundry bag with a draw string on top". One man was wearing a gray suit and a "fedora" hat, the other a black Nehru jacket. Their car was parked within two blocks of the Alaska Fur Company.

A short time after these events had transpired, Officer Holbrook of the Wyoming Police Department, who had worked the 7 a.m. to 3 p.m. shift on September 30, 1968, was leaving police headquarters and driving down US 131 toward his home in Dorr, Michigan. At approximately 3:30 p.m., he was passed while driving southbound on US 131 near 76th Street by three men in a 1967 yellow 2-door Chevrolet hardtop, bearing Ohio license plates numbered GE-8178. This Chevrolet was heading south "at a high rate of speed" at the time. Officer Holbrook made a "mental note of it", and when he arrived home and heard about the Alaska Fur robbery on the radio he immediately called the Grand Rapids Police and reported what he had observed.

Back at the Alaska Fur Company Store, Mr. Bourbon discovered upon regaining consciousness that he too had been robbed and that his wallet was missing. This wallet, minus the money that had been in it, was returned to him at about 6 p.m. that same evening by Michigan State Police Troopers from the Wayland Post. They had found it along the roadside on US 131 in Allegan County.

At approximately 2:30 a.m. the next morning, October 1, 1968, Trooper Dennis C. Fisher of the Ohio State Highway Patrol was proceeding westbound on

the Ohio Turnpike just west of the Sandusky County line. He observed a 1967 Chevrolet traveling eastbound at a high rate of speed, crossed the median, and gave chase. Trooper Fisher clocked the Chevrolet on Vascar at "slightly in excess of 100 miles an hour in a 70 mile an hour zone" and overtook and stopped this vehicle just inside Sandusky County. The vehicle was found to be a canary yellow 2-door 1967 Chevrolet sports coupe with Ohio license plate number GE-8178. Defendant Clarence Williams was in the front passenger seat and his codefendant David Willis, who was wearing a black Nehru jacket, was driving. This automobile was registered to one R. Waite Stennett of Cleveland, Ohio, and defendant Willis had in his possession the registration for a black 1965 Cadillac brougham, Illinois license plate number RC-7211.

The Cadillac brougham automobile owned by defendant David Willis was linked with the case through the testimony of a private citizen named Robert Paul Woltjer, a reserve officer with the Michigan State Police. Mr. Woltjer testified that at 1:30 p.m. on Friday, September 27, 1968, he was driving northbound on US 131 just south of Grand Rapids when he was passed by a "pretty good sized car", which was "either an Oldsmobile or some General Motors car", bearing 1968 Illinois license plate number RC-7211. This vehicle exited at Ionia Street in Grand Rapids and because he was "a little bit suspicious", Mr. Woltjer made a mental note of it and reported it to the police after hearing of the robbery a few days later. Trooper Fisher testified that this same Cadillac automobile was found broken down in the eastbound lane of traffic at the interchange between the Indiana and Ohio Turnpikes on the night of September 27, 1968.

On October 25, 1968, FBI Special Agents Thomas L. Brannick and Robert Cooper, together with Grand Rapids Police Detective Paul McGuire, showed a group of ten photographs to Mr. Bourbon and Mrs. Wietke at their respective homes. Mr. Bourbon picked the photograph of defendant Clarence Williams out from the others and set it aside. In a similar fashion, Mrs. Wietke picked out the photographs of defendants Clarence Williams and David Willis and set them aside. At trial Mrs. Wietke stated she couldn't identify anyone. At trial Mr. Bourbon testified in part as follows:

"*Q.* [*By Mr. Zerial, assistant prosecuting attorney*]: Do you see any of these men in the courtroom today that you are able to make an identification of?

"*A.* That man with the red tie, red and white tie could be him, but I would not swear to it.

"*Q.* Could it be which one, sir, we are talking number 1 and ———

"*A.* It could be number 2.

"*Q.* Why do you say that?

"*A.* Because he was standing right in front of me, staring at me.

"*Q.* Number 2 man and had number 2 man been in the store earlier that day?

"*A.* He was in that morning and also in the afternoon.

"*Q.* And you talked with these men, 1 and 2 earlier in the morning?

"*A.* Right.

"*Q.* About ten minutes?

"*A.* Right.

"*Q.* What is the closest you got to one and two in the morning, numbers one and two in the morning?

"*A.* Right across from that round table.

"*Q.* So you were at the same table——

"*A.* The round table is possibly four feet in diameter."

Very important identification testimony was given by Mr. Carl Reed as follows:

"*Q.* [*By Mr. Zerial*]: Now, sir, I'm going to go back and ask you to—if you can—to identify how numbers 1 and 2 were dressed and I am going to put on the blackboard the numeral 3.   Now were 1, 2, and 3 dressed the same in the morning as they were in the afternoon?

"*A.* They were.

"*Q.* Could you tell us how number 1 was dressed that day?

"*A.* Number 1 had a dark gray business suit on, a gray hat and wore dark glasses.

"*Q.* He was the one with the attache case?

"*A.* That's correct.

"*Q.* I think you also testified he had a gun later on?

"*A.* Yes.

"*Q.* How about number 2, the man who struck Mr. Bourbon?

"*A.* The number two was dressed in what I would say was casual, a tan poplin jacket on, black beret-type—I would call it a beret-type cap.

"*Q.* Anything else about this second man that you can describe?

"*A.* Just his features.

"*Q.* Could you describe those for us?

"*A.* Tall, slender, pock mark on the side of the face.

"*Q.* Pock marks on the side of the face?

"*A.* Yes, sir.

"*Q.* Anything else about him?

"*A.* Nothing in particular.

"*Q.* I don't know if you described whether or not he had a jacket on?

"*A.* Yes.

"*Q.* What type of jacket?

"*A.* A tan poplin jacket.   I think it was tan as near as I can remember.   I know it was a poplin jacket, casual jacket.

"*Q.* This number 3 man that you have described, could you re-describe him as far as his clothing or features?

"*A.* Medium height, dark Nehru-type suit or coat on and bare headed, that's about all.

"*Q.* Do you see either or any of the individuals that you say participated in this robbery, either 1, 2, or 3 in the courtroom today?

"*A.* I see number 2 and 3.

"*Q.* You see number 2 and number 3. Which one is number 2?

"*A.* Number 2 is the one with the rose colored shirt.

"*Q.* Seated next to his counsel?

"*A.* Next to him, to Mr. Leonard.

"*Q.* Where would be number 3?

"*A.* Number 3 would be sitting to the right or to my left—his right, your right.

"*Mr. Zerial:* May the record indicate that he has identified number 2 as Clarence Williams and number 3 as David Willis.

"*The Court:* I believe it's exactly the opposite.

*The Witness:* Number 3 was David Willis.

"*Mr. Leonard* [counsel for defendant Willis]: Well, your Honor, he just identified the man with the rose colored shirt as number 2. That was the man—

"*The Witness:* I'm sorry, number 3.

"*Mr. Leonard:* —as the man on the left or right as number 3. Now—

"*The Witness:* Number 3.

"*The Court:* Just a minute.

"*Mr. Leonard:* Now when given the names he wants to switch it back. I will object to this kind of leading and I will ask that he not be permitted to impeach the witness at this time.

"*Mr. Zerial:* I just asked for the record to be identified. If you have any objection, we will go into that.

"*Q.* Now do you understand my question?

"*A.* Perhaps you better repeat it.

"*Q.* I am trying to establish whether or not you can identify any of the individuals, 1, 2, or 3 as being in the courtroom today?

"*A.* Yes.

"*Q.* Now I am asking which individuals you can identify.

"*A.* By number? Number 3 and number 2.

"*Q.* Now going into the numerical order, would you identify number 2 and where he is seated in the courtroom today and how he is dressed today?

"*A.* Number 2 is sitting next to the wall on your right with the gray suit.

"*Q.* Would you come over for the record, and point to him? I want you to get out of the witness chair and go over and point to the man that you say is number 2.

"*A.* (*Complying with the request.*) This would be the man, number 2.

"*Q.* And which would you say is number 3?

"*A.* Number 3. (*Indicating.*)

"*Mr. Leonard:* Your Honor, I am going [to] ask that Mr. Reed's testimony be stricken because he has just within the last five minutes reversed himself on the most important issue in the case and I say that his testimony on the face of it is so unreliable as to not be valuable enough to be considered in this case and I would ask that the jury be instructed to disregard Mr. Reed's testimony.

"*The Court:* The motion is denied. It is a question of fact for the jury to decide upon the testimony of Mr. Reed himself. You may proceed.

"*Mr. Zerial:* May the record so indicate, your Honor?

"*The Court:* The record may so indicate.

"*Q.* Now you identified Mr. Willis as being number 3, is that correct?

"*A.* Yes."

Clarence Williams and David Willis were the only two defendants on trial at the time and it is obvious

that the witness identified Williams as one of the men that perpetrated the armed robbery.

The identification of defendant Williams was properly shown by direct testimony and circumstantial evidence. This evidence, if believed by the jury, was amply sufficient to justify a finding that the defendant was one of the men who perpetrated the armed robbery. Under these circumstances the defendant's conviction by the jury was proper. *People v Kern*, 6 Mich App 406 (1967); *People v Garcia*, 33 Mich App 598 (1971).

Affirmed.

All concurred.